FILED

October 31, 2016

IN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 9:50 AM



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### COURT OF WORKERS' COMPENSATION CLAIMS
### AT JACKSON

| | | |
|---|---|---|
| **DEBORAH GOODMAN,** | ) | **Docket No.: 2016-07-0051** |
| **Employee,** | ) | |
| **v.** | ) | |
| | ) | |
| **SCHWARTZ PAPER COMPANY,** | ) | **State File Number: 95295-2014** |
| **Employer,** | ) | |
| **And** | ) | |
| | ) | |
| **SEDGWICK CMS,** | ) | **JUDGE AMBER E. LUTTRELL** |
| **Insurance Carrier/TPA.** | ) | |

---

### COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge for a Compensation Hearing on September 27, 2016, pursuant to Tennessee Code Annotated section 50-6-239 (2015). The parties stipulated Ms. Goodman sustained a compensable work injury on December 1, 2014. The remaining disputed issue concerns Ms. Goodman's degree of permanent impairment. The parties presented competing impairment ratings from Dr. John Masterson, the authorized treating physician, and Dr. Samuel Chung, Ms. Goodman's evaluating physician. The legal issue before the Court is whether Ms. Goodman successfully rebutted the presumption of accuracy afforded Dr. Masterson's permanent impairment rating by a preponderance of the evidence.[1] For the reasons set forth below, the Court holds Ms. Goodman failed to do so.

### History of Claim

Ms. Goodman is a fifty-eight-year-old resident of Gibson County, Tennessee, employed by Schwartz Paper Company.[2] On December 1, 2014, Ms. Goodman worked as

---

[1] The parties stipulated to pertinent findings of facts set forth in the Appendix of this Compensation Order and more fully set forth in the Technical Record as Exhibits 5 and 6.

[2] Ms. Goodman presently works as a team leader at Schwartz Paper Company.

1

a "lumping clerk"[3] and sustained an injury to her back and right hip. (T.R. 1.) She testified that, while walking and checking boxes, a forklift operator lifted a wooden skid that broke and boxes on the skid fell onto her right side. Ms. Goodman experienced pain in her back, hip, and right leg.

Schwartz accepted Ms. Goodman's injury as a compensable claim and provided authorized medical treatment with several providers. She eventually treated with her panel-selected orthopedist, Dr. John Masterson, and later underwent evaluation, at her attorney's request, by Dr. Samuel Chung. The parties took the depositions of both physicians in this case.

*Treatment and Impairment Ratings*

Dr. Masterson first saw Ms. Goodman on February 26, 2015. (Ex. 3 at 6.) He noted her history of injury and her complaints of right lower lumbar and sacroiliac pain and tingling into her fourth and fifth toes. On physical exam, he found no clinical evidence of radicular pain. *Id.* at 7. Specifically, Dr. Masterson noted a negative straight-leg raise test, intact light touch sensation, and no focal weakness on motor strength testing bilaterally. *Id.* at ex. 6.

Dr. Masterson reviewed the radiology reports and films of MRIs performed on Ms. Goodman's lumbar spine and right hip. *Id.* at 7-8. The lumbar spine MRI revealed no disc herniation. *Id.* at 7. Dr. Masterson opined the hip findings, "were really non-specific, and they could have been found on somebody with no complaints of pain." *Id.* at 9. Based upon her history, exam, and MRI findings, Dr. Masterson diagnosed "lumbar sprain/strain with sacroiliitis." *Id.*

Ms. Goodman returned to Dr. Masterson on two more occasions prior to reaching maximum medical improvement (MMI). *Id.* Dr. Masterson did not find any evidence of radiculopathy on clinical exam. Dr. Masterson treated Ms. Goodman conservatively for her injury with medication, physical therapy, and modified duty restrictions, and placed her at MMI on April 9, 2015. *Id.* at 10-11.

Ms. Goodman continued working for Schwartz throughout her treatment. *Id.* Dr. Masterson testified that, at the time of MMI, Ms. Goodman did not complain of any activities causing her discomfort. He noted her continued complaint of some pain down the right lower extremity and noted a previous sacroiliac injection provided temporary relief. *Id.* at 11. On exam, Dr. Masterson found no point tenderness on palpation of the lumbar spine. He noted most of her discomfort was localized in the right sacroiliac region. She still had a negative seated straight-leg raise test and her motor and sensory findings were intact bilaterally. *Id.* at ex. 6.

---

[3] The lumping clerk ensures that all boxes removed from the semi-trucks are stacked and numbered correctly.

Following MMI, Ms. Goodman returned to Dr. Masterson, and he ordered an EMG-nerve conduction study (NCS) to check for a nerve issue based on her continued complaints. *Id.* at 13. The results of the EMG/NCS were unremarkable. Dr. Masterson maintained that he did not find any medically-defined radiculopathy. *Id.* On her last visit of June 18, 2015, Dr. Masterson refilled Ms. Goodman's prescription for Flexeril and continued her on full-duty work. *Id.* She did not report any problems with continuing full-duty work and has not returned since for any further treatment. *Id.* at 15-16.

Dr. Masterson assessed a 2% impairment to the body as a whole based upon a diagnosis of lumbar sprain/strain in Table 17-4 of the <u>American Medical Association's Guides to the Evaluation of Impairment, 6th Edition</u> ("AMA Guides"). *Id.* at 17. Dr. Masterson placed Ms. Goodman in Class 1, which is the class for a "documented history of sprain/strain type injury with continued complaints of axial and/or non-verifiable radicular complaints and similar findings documented in previous examinations and present at the time of evaluation." (Ex. 1.) Dr. Masterson testified Ms. Goodman's two return visits after MMI did not alter his impairment opinion. *Id.* at 18.

Dr. Masterson did not assign any impairment for Ms. Goodman's hip because he did not diagnose any injury specific to the hip. *Id.* at 21-22 and ex. 5.

Ms. Goodman subsequently underwent an independent medical examination (IME) with Dr. Samuel Chung. (Ex. 2 at 7.) He agreed the lumbar MRI clearly showed no findings of a herniated disc and the EMG/NCS was normal, showing no entrapment neuropathy, plexopathy, or radiculopathy. *Id.* at 11-12. Dr. Chung testified an MRI can confirm whether someone has radiculopathy, along with a history and clinical exam findings. *Id.* at 13. He stated an EMG/NCS can help rule in a condition like radiculopathy, but it cannot be used to completely rule it out. *Id.* at 11.

On physical exam of the lumbar spine, Dr. Chung noted decreased lumbar extension, rotation, and side bending on the right side. *Id.* at 15. He found a right-sided positive straight-leg raise test in both seated and supine positions.[4] Dr. Chung further noted decreased reflexes at the patella and Achilles and an absent medial hamstring reflex in the right lower extremity. *Id.* at 16. His sensory exam indicated decreased light touch sensation at the L5 dermatomal distribution. *Id.* He further noted Ms. Goodman exhibited pain in the right sacroiliac joint with deep palpation. *Id.* Dr. Chung testified that Dr. Bingham also performed a physical exam on the date of Ms. Goodman's EMG/NCS and noted decreased sensation at the posterior thigh, leg, and lateral foot. *Id.* at 28.

Dr. Chung diagnosed, "residual from low back injury secondary to traumatic event with ongoing right lumbar radiculopathy, and residual from trauma to the right sacroilium with ongoing right trochanteric bursitis." *Id.* at 24-25.

---

[4] Dr. Chung testified the straight-leg raise exam tests the root tension sign. (Ex. 2 at 19.)

Concerning his hip diagnosis, Dr. Chung stated, "I really didn't necessarily use the right hip MRI to confirm or not confirm her diagnosis. I think that her trochanteric bursitis is not necessarily found in her imaging findings anyhow. I think that the - - bursitis came about, I think, because of the lumbar radicular symptoms and subsequent alteration of gait may have more than likely caused the bursitis." *Id.* at 57. He further stated, "chronic trochanteric bursitis . . . is my clinical diagnosis that I could make is that that came about in my opinion not necessarily from the trauma itself." *Id.* at 58.

Dr. Chung assigned an impairment rating of 12% to the body for the back, based on Table 17-4 on page 570 of the AMA Guides. Dr. Chung rated Ms. Goodman in the "Motion Segment Lesions" section and placed her in Class 2, which requires, "Intervertebral disk herniation and/or AOMSI at a single level with medically documented findings; with or without surgery and documented radiculopathy at the clinically appropriate level present at the time of examination."[5] *Id.* at 39. Dr. Chung supported his use of this section stating, "that's the only section that actually has a diagnosis of radiculopathy." He further stated, "Class 1 in the strain section, only has a nonverifiable radicular complaints but not radiculopathy. . . So, essentially I am forced to use a section that clarifies a radiculopathy diagnosis." *Id.* at 40.

Dr. Chung additionally assessed an impairment rating of 3% to the body for his diagnosis of trochanteric bursitis of the hip based on Table 16-4 of the AMA Guides. *Id.* at 42. Dr. Masterson challenged Dr. Chung's rating of 3% for trochanteric bursitis of the right hip, stating he never found trochanteric bursitis on any exam and never found an altered gait. (Ex. 3 at 20.) Her pain was in the sacroiliac region, not in the bursa region. *Id.*

*Physicians' Opinions Regarding Radiculopathy*

Dr. Masterson and Dr. Chung differed completely in their opinions on whether or not Ms. Goodman suffered from radiculopathy.

*a. Dr. Masterson*

In his deposition, Dr. Masterson testified he never diagnosed the pain down Ms. Goodman's right lower extremity as radiculopathy. *Id.* He explained there is a difference between a complaint of pain going down the leg and a medical definition of radiculopathy. *Id.* at 11-12. Dr. Masterson stated, "Radiculopathy is basically felt to be nerve root pain and there's certain findings on physical exam which indicate that, and typically you'll have findings on the MRI study that will correlate with that and she did not have that." *Id.* at 12. Dr. Masterson rated Ms. Goodman in Class 1 for nonverifiable radicular complaints. The AMA Guides define nonverifiable radicular complaints on

---

[5] AOMSI- Alteration of Motion Segment Integrity

4

page 576 as follows:

> Nonverifiable radicular complaints are defined as chronic persisting limb pain or numbness, which is consistently and repetitively recognized in medical records, in the distribution of a single nerve root that the examiner can name and with the following characteristics: preserved sharp vs. dull sensation and preserved muscle strength in the muscles in innervates, is not significantly compressed on imaging and is not affected on electrodiagnostic studies. Although there are subjective complaints of a specific radicular nature, there are inadequate or no objective findings to support the diagnosis of radiculopathy.

(Ex. 2 at ex. 4.)

Schwartz contended Ms. Goodman fits squarely within this definition based upon Dr. Masterson's findings and the objective diagnostic studies.

Dr. Masterson testified to his disagreement with Dr. Chung's impairment ratings. He stated, "In general, ratings are more correct in my opinion when they take into account objective findings both on clinical exam and objective studies." (Ex. 3 at ex. 5.) Specifically, Dr. Masterson stated, "Dr. Chung was clearly relying more on the subjective complaints and he stated in his IME, 'Lastly, clinical study adjustments is not applied due to the fact that the patient's clinical symptoms far outweigh the imaging studies.'" Dr. Masterson further disagreed with Dr. Chung's use of Table 17-4 on page 570 for an intervertebral disk herniation and/or AOMSI, when her lumbar MRI showed no disk herniation and her EMG/NCS of the right lower extremity was normal. Finally, he testified he found no radiculopathy in any of his examinations, which is required in the AMA Guides to justify a Class 2 impairment rating of 12%.

### b. Dr. Chung

Dr. Chung diagnosed radiculopathy and referred to the AMA Guides' definition of radiculopathy on page 576, which states,

> For the purposes of the *Guides*, *radiculopathy* is defined as significant alteration in the function of a single or multiple nerve roots and is usually caused by mechanical or chemical irritation of one or several nerves. The diagnosis requires clinical findings including specific dermatomal distribution of pain, numbness, and/or parasthesis. Subjective reports of sensory changes are more difficult to assess; therefore, these complaints should be consistent and supported by other findings of radiculopathy. There may be associated motor weakness and loss of reflex. A root tension sign is usually positive. The identification of a condition that may be

5

associated with radiculopathy (such as a herniated disk) on an imaging study is not sufficient to make a diagnosis of radiculopathy; clinical findings must correlate with the radiographic findings in order to be considered.

(Ex. 2 at ex. 4.)

Dr. Chung opined Ms. Goodman has radiculopathy from a chemical irritation[6] of the nerve rather than a mechanical irritation[7] that he stated can occur event without having a herniated disc. (Ex. 2 at 35.) He testified, "In this case I would more likely clinically feel that this is due to a chemical neuritis causing a radiculopathy of the right lower extremity[.]" *Id.* at 41-42. He opined Ms. Goodman met the AMA Guides definition of radiculopathy based on his exam findings of reflex loss, sensory loss, and a positive straight-leg raise test. *Id.* at 37.

Dr. Chung disagreed with Dr. Masterson's diagnosis and questioned the accuracy of his physical examinations. Dr. Chung stated, "I didn't see a neurological examination in his office notes. He did some cursory examination but not specific neurological exam." *Id.* at 19. He also criticized Dr. Masterson for not performing a reflex exam on the April 9 visit where Ms. Goodman reached MMI. On cross-examination, Dr. Masterson agreed that he did not test Ms. Goodman's reflexes on her April 9 visit. Ms. Goodman's counsel asked Dr. Masterson if reflex changes are significant for purposes of determining if a patient has radiculopathy and Dr. Masterson responded, "They do not always correlate, but if they're positive or they're asymmetric, they could indicate radiculopathy." (Ex. 3 at 35.)

Ms. Goodman filed a Petition for Benefit Determination seeking permanent partial disability benefits. The parties did not resolve the disputed issues through mediation. This hearing followed.

At the Compensation Hearing, Ms. Goodman testified to continued symptoms in her back and right lower extremity for which she takes Naproxen to dull the symptoms. She remains employed at Schwartz and was promoted to a team leader position. She argued she is entitled to permanent partial disability benefits for injuries to her back and right hip based upon Dr. Chung's impairment ratings. She contended her testimony combined with the testimony of Dr. Chung sufficiently rebutted the presumption of accuracy afforded to Dr. Masterson.

---

[6] Dr. Chung described chemical irritation as follows: "If the nucleus pulposus happens to come out or tear away from the inner and then causes a chemical reaction to the nerve root, that is what we call a chemotactic reaction causing inflammation of the nerve root, causing redness, beefy redness, and inflammation, and that in turn changes the signals and the symptoms of the nerve that goes down further into a specific dermatome." (Ex. 1 at 35.)

[7] Dr. Chung stated a mechanical irritation is referring to a disc herniation, tumor, or something that physically compresses a nerve root. (Ex. 1 at 34.)

6

Schwartz countered that Dr. Chung's opinions regarding impairment for the back and hip are not sufficient to overcome the presumption of accuracy attached to Dr. Masterson's impairment opinion. It argued that Ms. Goodman did not have documented radiculopathy according to Dr. Masterson and the MRI and EMG/NCS findings. Schwartz further contended Dr. Chung utilized the wrong section of Table 17-4 in rating Ms. Goodman and that Dr. Chung's diagnosis of hip trochanteric bursitis based on subjective findings was unsupported by the evidence. Finally, Schwartz referred the Court to page 573 of the AMA Guides, which provides, "Impairment related to radicular complaints is included in the range of values for each diagnosis and accounted for by grade, using the adjustment grid. *There is no separate impairment for radiculopathy, unless specified in the regional grid.*" (Ex. 1.) (Emphasis added.)

**Findings of Fact and Conclusions of Law**

Ms. Goodman has the burden of proof on all essential elements of her claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015). In analyzing whether Ms. Goodman has met her burden, the Court will not construe the law remedially or liberally in her favor, but instead must construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither Ms. Goodman nor Schwartz. *See* Tenn. Code Ann. § 50-6-116 (2015).

*Compensability and Medical Benefits*

The parties stipulated this is a compensable claim. As this is a compensable claim, the Court finds Ms. Goodman is entitled to reasonably necessary future medical treatment as recommended by her authorized treating physician, Dr. Masterson, and as required by Tennessee Code Annotated section 50-6-204 (2015).

*Extent of disability*

For post-July 1, 2014 injuries, permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 506-207(3)(A) (2015). Because Ms. Goodman returned to employment at the same or greater wage during her initial compensation period, she is limited to these benefits and not entitled to any enhancement factors.

7

As noted, Dr. Masterson assessed a 2% permanent impairment to the body as a whole pursuant to the AMA Guides for Ms. Goodman's back injury. (Ex 3.) Dr. Chung, using the same reference, assessed a 12% permanent impairment for the back and 3% impairment for the hip. (Ex. 1.) Subject to rebuttal by a preponderance of the evidence, Dr. Masterson's impairment rating is presumed accurate. Tenn. Code Ann. § 50-6-204(k)(7) (2015).

In considering whether Ms. Goodman rebutted Dr. Masterson's rating by a preponderance of the evidence, the Court notes Dr. Chung challenged the correctness of Dr. Masterson's impairment rating for the back by testifying his examinations were deficient. Dr. Chung testified, "I didn't see a neurological examination in his office notes. He did some cursory examination but not [a] specific neurological exam." *Id.* at 19. The Court finds Dr. Chung's testimony unpersuasive.

Dr. Masterson's records indicated he consistently performed straight-leg raise testing, sensory exams of the lower extremities, and motor-strength testing of the lower extremities. (Ex. 3 at ex. 6.) Moreover, Dr. Masterson testified he examined Ms. Goodman for radiculopathy. He repeatedly and unequivocally stated he never found radiculopathy on any physical examination over his five-month course of treatment. (Ex. 3 at 9 and 14.) Moreover, Ms. Goodman's normal lumbar MRI and normal EMG/NCS were consistent with Dr. Masterson's findings. All of these examinations and tests are neurologic in nature.

Ms. Goodman specifically argued Dr. Masterson's exam on April 9, 2015, the date she reached MMI, was deficient because he did not test her reflexes. Dr. Masterson agreed the presence of positive reflex findings could indicate radiculopathy.[8] While Dr. Masterson acknowledged in his deposition that he did not test her reflexes on April 9, the Court notes that Dr. Masterson did test Ms. Goodman's reflexes on her next visit of May 4, and he further testified that his exam findings on May 4 did not change his diagnosis or rating; and that she still did not have medically defined radiculopathy. *Id.* at 14. In addition, to further check for any nerve issue, Dr. Masterson ordered an EMG/NCS on May 4, which was consistent with his exam findings and indicated no entrapment, neuropathy, plexopathy, or radiculopathy. *Id.* at 14.

Concerning Ms. Goodman's diagnosis and impairment for her back injury, the Court is persuaded that Dr. Masterson's diagnosis and assignment of Class 1 impairment for "continued complaints of . . . *nonverifiable radicular complaints* and similar findings documented in previous examinations and present at the time of examination" were

---

[8] The Court notes Ms. Goodman's testimony asserting Dr. Masterson did not examine her on April 9. However, the Court resolves this conflict in testimony in Dr. Masterson's favor based upon his office note of April 9 reflecting his physical exam findings "today" and his testimony regarding his exam findings on that date. Moreover, the Court notes despite Ms. Goodman's testimony of no exam, she argued, through counsel, that Dr. Masterson's April 9 exam was deficient, which acknowledges there was an exam performed.

8

fundamentally sound and consistent with the directives of the AMA Guides.

To hold otherwise, as Ms. Goodman requests, would require the Court to ignore or disregard the negative exam findings of Dr. Masterson on five visits over the course of five months, the normal lumbar MRI, the normal EMG/NCS, and the impairment rating directives of the AMA Guides. The Court declines to do so.

Concerning the hip, the Court notes Dr. Chung diagnosed trochanteric bursitis based upon his one-time exam and his finding of an altered gait that he attributed to lumbar radiculopathy. Dr. Masterson testified he never found trochanteric bursitis on any exam and never found an altered gait. (Ex. 3 at 20.) He testified Ms. Goodman's pain was in the sacroiliac region, not in the bursa region. *Id.* The Court finds the proof insufficient to support Dr. Chung's separate diagnosis and impairment rating for the hip.

Accordingly, upon thorough consideration of the evidence, the Court holds Ms. Goodman has not rebutted the presumption of accuracy of Dr. Masterson's rating and sets the impairment rating at 2% to the body as a whole resulting in nine weeks (450 weeks multiplied by 2%) of benefits. At her stipulated compensation rate of $313.44, Ms. Goodman is entitled to permanent partial disability benefits totaling $2,820.96.

### Discretionary Costs

Ms. Goodman filed a Motion to Assess Discretionary Costs. (T.R. 7.) Ms. Goodman also filed a Bill of Costs totaling $1,183.25, itemized as follows:

| | | |
|---|---|---|
| 1. | Deposition fee of Dr. Samuel Chung | $750 |
| 2. | Court reporter fee for the Deposition of Dr. Chung | $341 |
| 3. | Court reporter fee for the Deposition of Dr. Masterson | $92.25 |

Ms. Goodman argued these costs were accurate, reasonable, and necessary in the preparation for trial in this action and are recoverable costs. Schwartz filed an Objection in Opposition to Employee's Motion for Discretionary Costs. (T.R. 8.)

At the Compensation Hearing, Schwartz conceded Ms. Goodman is entitled to the transcript fee for Dr. Masterson's deposition of $92.25, but maintained the remaining costs are disputed. Schwartz argued Ms. Goodman is not entitled to deposition or court reporter costs associated with the independent medical evaluation of Dr. Chung. It contended Rule 54.04 of the Tennessee Rules of Civil Procedure describes the allowable discretionary costs as "reasonable and necessary expert witness fees." In the event the Court holds Ms. Goodman did not overcome the presumption of accuracy afforded Dr. Masterson, Schwartz argued Dr. Chung's deposition was not reasonable and necessary and should not be taxed to the employer.

9

Here, in light of the Court's decision that Ms. Goodman did not successfully rebut the presumption of accuracy afforded to Dr. Masterson, the Court, in its discretion, denies the request for the costs associated with Dr. Chung's deposition. Ms. Goodman's motion for the reasonable and necessary deposition costs for Dr. Masterson's deposition is granted.

**IT IS, THEREFORE, ORDERED** as follows:

1. Ms. Goodman shall recover from Schwartz Paper Company permanent partial disability benefits in the amount of $2,820.96, representing a 2% permanent partial disability to the body, or 9 weeks of compensation at the stipulated compensation rate of $313.44. These benefits, having accrued, are payable in a lump sum.

2. Ms. Goodman shall receive lifetime future medical benefits pursuant to statute.

3. Ms. Goodman is awarded a total amount of $92.25 for discretionary costs to be paid by Schwartz Paper Company.

4. Ms. Goodman's attorney is awarded an attorney's fee of twenty percent and any incurred expenses to be paid from Ms. Goodman's award.

5. Costs of this cause of $150.00 are assessed against Schwartz Paper Company pursuant to Tenn. Comp. R. and Reg. 0800-02-21-.07 (2015), to be paid within five days of this order becoming final.

6. The Employer shall prepare and file a Statistical Data Form within ten business days of the date of entry of this Order.

**ENTERED this the 31st day of October, 2016.**

**Judge Amber Luttrell**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be "final" (see Tennessee Code Annotated section 50-6-239(c)(7)) and you must comply with the Tennessee Rules of Appellate Procedure.

# APPENDIX

Exhibits:

1. AMA Guides Sixth Edition-Tables 17-4 and 16-4;
2. Deposition Transcript of Dr. Samuel Chung;
3. Deposition Transcript of Dr. John Masterson; and,
4. Employee's Responses to Request for Admissions.

Technical record:[9]

1. Petition for Benefit Determination;
2. Pre-Discovery and Post-Discovery Dispute Certification Notices;
3. Request for Initial Hearing;
4. Initial Hearing Order;
5. Employee's Pre Compensation Hearing Statement;
6. Employer's Pre Compensation Hearing Statement;
7. Employee's Motion to Assess Costs; and
8. Employer's Response to Employee's Motion to Assess Costs.

---

[9] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Stipulations of Fact:

1. Ms. Goodman sustained an injury by accident arising primarily out of and in the course and scope of her employment.
2. Ms. Goodman's date of injury is December 1, 2014.
3. Ms. Goodman gave notice of the injury to the Employer on December 1, 2014.
4. Ms. Goodman is fifty-eight years old and resident of Gibson County.
5. Ms. Goodman is a high school graduate.
6. Ms. Goodman received authorized medical treatment with Madison Family Practice, Sports Orthopedic and Spine, Dr. John Masterson, Dynamax PT and Dr. Ron Bingham.
7. All authorized medical expenses have or will be paid by Employer.
8. Ms. Goodman reached maximum medical improvement on April 9, 2015.
9. As Ms. Goodman has continued working for Schwartz earning the same or greater wages as she was earning prior to the injury, no multiplier factors apply.
10. Ms. Goodman's average weekly wage is $470.14 and compensation rate is $313.44.
11. Ms. Goodman did not miss sufficient time from work to qualify for any temporary disability benefits.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 31st day of October, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|---------------|---------|-----------|------------------|
| Jay DeGroot, Esq., Employee's Counsel | | | X | jdegroot@garretylaw.com ghayes@garretylaw.com |
| Kitty Boyte, Esq., Employer's Counsel | | | X | kboyte@constangy.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims

14